AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone inventoried as 4122023CE053 Item #1 &<br>White USB drive labeled "The Suburban Connection" | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **23mj1964-JLB**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein,

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1029(a)(2) | Access Device Fraud |

The application is based on these facts:

See Attached Affidavit of USSS Special Agent Ottarson, incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

USSS Special Agent Alan Ottarson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:   _____ 06/02/2023 _____

_____
*Judge's signature*

City and state:   San Diego, California

Hon. Jill L. Burkhardt, US Magistrate Judge
*Printed name and title*

## STATEMENT OF FACTS

I, Alan Ottarson, being duly sworn, state as follows:

1.      I am a Special Agent with the United States Secret Service ("USSS") and have been for approximately seven years.  During my time as a Special Agent with the USSS, I have participated in numerous investigations of fraud and money laundering schemes, among other things, and have conducted or participated in physical surveillance, the execution of search warrants, including search warrants for electronic and cellular devices, and the review of financial records, electronic communications, and other electronic evidence.

2.      The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this and related investigations into California Electronic Benefit Transfer (EBT) fraud; my review of documents and records related to this and related investigations; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I or others have learned during this investigation. Dates, times, and amounts are approximate.

## STATEMENT OF PROBABLE CAUSE

*Overview*

3.      The United States Secret Service (USSS) and the Southern California Cyber Fraud Task Force (SoCal CFTF) are working with state and federal agencies to investigate the theft and misuse of funds electronically distributed to individuals receiving public assistance.

4.      This Affidavit is submitted in support of a Complaint for Devonte Linell Pipkins and warrants to search one cell phone and one white external USB storage device for evidence of and relating to unauthorized access device fraud.  On June 2, 2023, Devonte Pipkins withdrew $4,320 from San Diego County ATMs using four

access devices in the form of Visa Debit/Credit cards and a Michigan State Electronic Benefits card that were encoded with California EBT account information issued to someone else.

*Background on Electronic Benefit Transfer Cards*

5.     In the summer of 2022, California's Department of Social Services (CalDSS) advised the SoCal CFTF that it had detected a rise in fraud associated with the electronic debit cards issued to individuals and families who qualify for California public benefits like CalFresh and CalWORKS.

6.     The U.S. Department of Agriculture also noticed a rise in fraud associated with the Supplemental Nutrition Assistance Program (SNAP) that it administers through its Food and Nutrition Service (FNS).  SNAP is a federally funded assistance program designed to help low-income individuals and families purchase food.  In California, SNAP public assistance benefits are distributed through CalFresh and loaded to an account that a qualified recipient access by means of an access card, similar to a debit or credit card, called the California Advantage Electronic Benefit Transfer (EBT) Card. The EBT card system was developed to enable government agencies in California and many other states to deliver public assistance benefits to recipients using electronic transfers. The EBT system is a computer-based system through which authorization for qualifying food purchases and cash withdrawls is received from either a point-of-sale (POS) terminal or an ATM.

7.     CalWORKS is a public assistance program that provides cash aid to eligible families with one or more children in the home.  Families that apply and qualify for ongoing CalWORKS assistance receive money each month to help pay for housing, food, and other necessary expenses.  CalWORKS, along with CalFresh, is distributed by CalDSS through the California Advantage EBT card.

8.     California public benefits associated with California's Employment Development Department (EDD) are being stolen in a similar way to CalFresh and

CalWORKS benefits.  In California, the EDD administers unemployment insurance, disability insurance, and paid family leave programs.  EDD benefits, like EBT benefits, are distributed via electronic transfers to an access device card that, like a debit card, enable the user to make cash withdrawals and payments.  In California, EDD benefits are distributed through an EBT card issued by Bank of America.

9.     After a recipient applies for, and is approved to receive, California public assistance benefits, the benefits are automatically distributed to the recipient's EBT or EDD card on a designated day of the month (typically, in California, the first five days of the month).  To access their benefits to purchase eligible food items, recipient swipe their card through a point-of-sale terminal, or insert it into an ATM, that records the card number, date, time, and amount of the transaction.  The recipient then enters his/her unique Personal Identification Number (PIN) into a keypad to complete the transaction.

10.     The USSS has gathered evidence indicating that members of what appear to be one or more criminal enterprises are stealing California EBT and EDD account information by installing skimmers on point-of-sale terminals, often by targeting point-of-sale terminals at large volume retailers, like Walmart, in communities with higher concentrations of public benefit recipients.  The skimmed data is then often re-encoded onto the magnetic strips of cards that members of the conspiracy use to make unauthorized withdrawals and purchases. These re-encoded cards are sometimes referred to as "cloned" cards.  Cloned cards can be a blank white plastic card, or another debit, credit, or gift card.  Cloned cards may have names or numbers embossed on the physical face of the card.  A common feature of cloned cards is that the account number encoded on the card's magnetic strip will not match the number embossed on the card's face.  To facilitate the use of the stolen EBT benefits, members of the scheme will commonly put stickers bearing the account's PIN on the physical cards, or access devices, that are swiped at a point-of-sale terminal along with the account balance.

11.     Data provided by CalDSS indicates that, between approximately August 2022 and January 2023, in the Southern District of California and elsewhere, more than approximately $38.9 million has been stolen using compromised EBT account information.  Most of the stolen funds were obtained through unauthorized ATM withdrawals.  CalDSS reports that approximately $2.3 million has been stolen through unauthorized ATM withdrawals in San Diego County and San Diego residents who receive EBT benefits have had approximately $2.9 million of their benefits fraudulently withdrawn at ATMs outside the county.

*Prior Southern California EBT Fraud Operations*

12.     In July and August 2022, the SoCal CFTF learned of connected incidents at Walmart stores in Chula Vista, National City, and Sherman Heights involving overlay skimmers that appeared to be part of the California EBT fraud scheme.[1]  According to police reports and records obtained by the task force, in June 2022, National City Police arrested a Romanian national who was caught installing an overlay skimmer without authorization at a National City Walmart.  The suspect had at least one coconspirator assist him with the installation.  (The coconspirator left the store before law enforcement arrived.)  In July 2022, employees at a Chula Vista Walmart discovered an unauthorized overlay skimmer installed on a point-of-sale terminal.  Store surveillance footage showed that the individual arrested by National City Police had, along with his

[1] An overlay skimmer is a skimmer that is part of a counterfeit faceplate designed to resemble the legitimate point-of-sale terminal. Overlay skimmers are mounted to the legitimate point-of-sale terminal and allow a victim's credit or debit card to be read by the legitimate terminal.  In the process of inserting the victim's credit or debit card into the legitimate terminal, the card is also read by the overlay skimmer, which stores the card's stolen electronic information for later unauthorized use.  The overlay skimmers at issue in the California EBT investigation are not designed to read credit or debit cards embedded with a chip (i.e., most credit and debit cards).  Unlike most bank-issued credit and debit cards, California EBT cards do not have chips (which makes the cards less expensive). The overlay skimmers that cannot read cards with chips therefore typically target California EBT cards.

unidentified coconspirator, installed the overlay skimmer at the Chula Vista Walmart two days before his arrest in National City. When arrested by National City Police, the suspect presented a fake European ID that misrepresented his name and nationality Record checks revealed his true name, Romanian nationality, and indicated that he had entered the U.S. without inspection.  Additional investigation revealed that this individual, or someone closely matching his appearance, had installed an overlay skimmer at a Sherman Heights Walmart in March 2022 with the assistance of two additional coconspirators.  The SoCal CFTF obtained a warrant (22MJ3289) to search the phone seized incident to the suspect's arrest.  The search showed that the phone was assigned to a Los Angeles phone number, which was consistent with statements the individual made to the arresting officer that he lived in the Los Angeles area.

13.    On the night of August 31, 2022, and into the early morning hours of September 1, 2022, the SoCal CFTF conducted surveillance of three San Diego ATMs that had previously been used to make unauthorized California EBT withdrawals.  With information provided by bank investigators, the task force identified and arrested two men.  Both presented fake European IDs at the time of their arrest that misidentified their names and nationalities.  Record checks ultimately revealed that both men were Romanian citizens who lacked legal status to be in the United States.  The SoCal CFTF filed state charges against the two defendants, who were released on bond and disappeared.  Both individuals are believed to reside in the greater Los Angeles area.

14.    In a search incident to their arrests, the SoCal CFTF found the men to be in possession of approximately $10,000, gift cards with magnetic strips, skimming tools, and a skimmer.  The gift cards all contained what appeared to be a PIN handwritten on them.  Task force members also found and seized multiple cell phones and a laptop.  Pursuant to a federal warrant (22MJ4389), the SoCal CFTF later searched these cell phones and laptop.

AFFIDAVIT

-5-

15.     The search showed that men used their phones to record ATM withdrawals, store and communicate about EBT cards and track data (e.g., the electronic account information encoded on a card's magnetic strip), coordinate Airbnb rentals, and included information for a rental car that was caught on surveillance cameras during an unauthorized ATM withdrawal. These search results were consistent with reports that individuals involved in Romanian California EBT skimming schemes were using rental cars and Airbnbs at the start of each month to conceal their identity and location while engaging in unauthorized EBT withdrawals designed to steal public assistance benefits before the rightful recipients could use them.   The results of the laptop search included photos and video showing a skimming device hooked up to what appeared to be the searched laptop. In the video, which showed the laptop's screen, the laptop user used a software program to extract and process raw skimmer data and then convert the data into usable track data that could then be encoded onto an access device's magnetic strip. The laptop contained multiple photos and videos of text files of converted track data, as well as internet browsing history showing the user(s) accessed websites that confirm if a credit or debit card number is open and active, as well as pinhole camera footage of what appeared to be ATM keypads where people were recorded entering what appeared to be PINs.

16.     Subsequent investigation by the USSS revealed that one or both of the men arrested on September 1, 2022 had, in coordination with additional unidentified coconspirators, made unauthorized EBT account withdrawals at San Diego County ATMs on the nights or early morning hours of 5/2/2022, 5/3/2022, 6/1/2022, 6/15/2022, 7/7/2022, 7/8/2022, 7/9/2022, 7/12/2022, 8/1/2022, 8/2/2022, 8/3/2022.   The largest withdrawals tended to be at the beginning of each month.  For example, on July 2, 2022, $16,990 was withdrawn from ATMs at one location (1775 Camino De La Reina) and, on August 2, 2022, $27,860 was withdrawn from ATMs at the same location. Surveillance footage also showed that an individual matching the appearance of one of

the men arrested had installed a skimmer at a San Diego convenience store in mid-July 2022 and returned a few days later to retrieve it.  This pattern of activity was consistent with reporting that the EBT fraud crews tended to use compromised EBT and EDD accounts to make unauthorized cash withdrawals at the start of each month and to install and retrieve skimmers at other times to harvest compromised EBT and EDD account information.

17.     In early February 2023 and early March 2023, the USSS's Los Angeles field office conducted similar surveillance operations at ATMs located in their district. Pursuant to these operations, the Central District arrested and charged 14 individuals for engaging in bank fraud, access device fraud, and/or aggravated identify theft.  All these individuals were found in possession of fraudulent EBT account information and two also possessed fraudulent EDD account information encoded onto access device cards.  At least three also possessed skimming devices and skimming-related tools. Between the 14 people charged, they possessed over 1000 fraudulent cards.  Of these cards, approximately 635 were encoded with compromised California EBT account information and approximately 388 were encoded with compromised EDD account information. Most of the cards were "Vanilla" gift cards that were encoded with compromised account information.  All 14 defendants were Romanian and all but one lacked status and appeared to have entered the United States without inspection.  Six of the defendants possessed fake European IDs that misidentified their names and nationalities.  All but one of the defendants was in possession of one or more cell phones.  The USSS is still reviewing these phones pursuant to a federal search warrant. Preliminary review of at least one defendant's phone shows the phone was used to research ATM locations.

18.     In late March 2023, the SoCal CFTF obtained arrest warrants (23MJ0914) for two Romanian nationals who conspired to use stolen EBT benefits to make over $250,000 in unauthorized SNAP transactions at grocery stores located in San Diego and

Riverside County.  To date, only one of the defendants has been arrested and she is charged by Information (23CR0794-RBM).  Search results for two phones seized from the charged defendant and searched pursuant to a federal warrant (23MJ0606) include geolocation information tying the conspirators to fraudulent activity, videos and photographs of fraudulent proceeds, and coconspirators' names, contact information, and communications.   The members of this conspiracy appear to have bought compromised EBT account information from a fellow Romanian.

*June 2023 San Diego Operation*

19.    On the night of June 1, 2023 and early morning of June 2, 2023, the USSS and SoCal CFTF initiated surveillance at U.S. Bank ATM located at 490 Fletcher Parkway, El Cajon, CA 92020.  The USSS selected this location based on historical records indicating that fraudulent EBT withdrawals had previously occurred at this ATM.  U.S. Bank operates in interstate and foreign commerce and its headquarters is in Minnesota.

20.    In the early morning hours of June 2, 2023 at approximately 0150, law enforcement observed an individual later identified as Devonte Pipkins approach an ATM located at 490 Fletcher Parkway, El Cajon, CA 92020. Pipkins arrived in the parking lot of the location in a red Nissan Versa sedan. Pipkins waited in his vehicle for several minutes before exiting the driver's seat and approaching the ATM.

21.    After Pipkins exited the vehicle wearing a black hooded sweatshirt with the words "Anti Social Social Club" printed on the back and approached the ATM, law enforcement observed him conduct approximately three transactions at the ATM over approximately five minutes. During these transactions, law enforcement observed Pipkins interact with the ATM while appearing to look over his shoulder as if he were looking to see if someone was watching him. Pipkins also appeared to put the cash in the front pocket of his hooded sweatshirt and withdraw additional access devices from the same pocket. Based upon my training and experience, while not inherently illicit,

individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

22.     While Pipkins was at the ATM, law enforcement received contemporaneous information from U.S. Bank while Pipkins was conducting the multiple observed withdrawal transactions. U.S. Bank confirmed that the first withdrawal transaction took place on an EBT account belonging to an individual named G.H.[2] Law enforcement also received contemporaneous information from Arizona's Department of Motor Vehicles confirming that the individual conducting the ATM withdrawals did not appear to match the individual in whose name the EBT account was registered. Additionally, U.S. Bank stated that a black male wearing a black hooded sweatshirt with the words "Anti Social Social Club" printed on the left chest had previously been conducting multiple ATM withdrawals at a different branch immediately prior to the current activity.

23.     In addition to the three observed transactions at the U.S. Bank ATM located at 490 Fletcher Parkway, U.S. Bank provided surveillance photos and transaction details for nine additional transactions that an individual matching Pipkins' appearance had completed at a different branch approximately 45 minutes prior to contact with law enforcement. Those surveillance photos showed Pipkins, wearing a black hooded sweatshirt with the words "Anti Social Social Club" printed on the left chest, accessing nine different EBT accounts issued to people whose names did not match Pipkins. The total amount withdrawn from both U.S. Bank ATMs by Pipkins was approximately $4,300.

24.     After observing approximately three transactions at the Fletcher Parkway ATM, a marked law enforcement unit arrived in the parking lot of the U.S. Bank for

---

[2] Law enforcement had access to the full name at the time but are using initials to protect the victim's privacy and economic security.

unrelated business and Pipkins left the ATM as the unit parked. Pipkins walked to his vehicle and entered the driver's seat as law enforcement approached from the rear of his vehicle. Law enforcement then verbally engaged with Pipkins, who quickly exited the vehicle and attempted to flee on foot. Law enforcement initiated a short foot pursuit, during which Pipkins emptied the contents of his pockets. Pipkins was given multiple verbal commands to stop fleeing and detained after he was physically restrained by law enforcement.

25.     Based on the date, time, ATM location, presence of multiple, successive ATM withdrawals on multiple EBT cardholder accounts during a short time period, mismatch of identities between Pipkins and the EBT account cardholder, law enforcement detained Pipkins to investigate further.

26.     Contained on Pipkins' person was approximately $1,000 of U.S. currency. Records provided by U.S. Bank indicate that, while at that Fletcher Parkway ATM location, Pipkins had conducted approximately $780 in total unauthorized ATM withdrawals.  U.S. Bank also provided law enforcement with surveillance photos that depicted Pipkins at the ATM conducting the unauthorized withdrawals, which was consistent with law enforcement's surveillance observations.

27.     When asked to identify himself, Pipkins provided the name Devonte Pipkins and date of birth of August 6, 1997. Pipkins stated he had a driver's license in his wallet, which had been discarded during the pursuit. A wallet containing an Arizona driver's license bearing the name Devonte Linell Pipkins was found on the ground near Pipkins' vehicle. The wallet also contained a U.S. Social Security card in the name of Aaron Dwayne Vinson Jr., four bank cards with the name Devonte Pipkins, and a white USB drive labeled "The Suburban Collection" in red lettering.

28.     Based upon the above relevant facts, the SoCal CFTF conducted a probable cause arrest of Pipkins on June 2, 2023 at approximately 0200 hours.

AFFIDAVIT

-10-

29.     Pipkins was processed for arrest and read his Miranda Warning. Pipkins did not choose to speak with law enforcement.

30.     Pursuant to Pipkins' arrest, in furtherance of an inventory search, and to preserve evidence that might otherwise be lost or destroyed, law enforcement conducted a search of the immediately accessible areas of the passenger compartment of his vehicle. The vehicle appeared to be a rental, with the registered owner being a leasing company. During the search, law enforcement found a magnetic card reader/encoder in the floorboard of the front passenger's seat. Law enforcement also found approximately $18,830 in U.S. currency in the glove compartment, along with four cloned EBT cards in the driver's side door, of which three were generic Visa Debit/Credit cards and one was a branded Michigan State Electronic Benefits card. Law enforcement confirmed these were cloned EBT cards by reading the magnetic stripe and determining through CalDSS that the cards belonged to other real individuals, not Pipkins.

31.     At the time of his arrest, Pipkins possessed one cell phone: an Apple iPhone 14 in a green case.  This phone was seized incident to arrest and inventoried as 4122023CE053 Item #1.  I submit there is probable cause to search the phone for evidence of and relating to skimming and EBT fraud-related activity.  As outlined in part above, individuals engaged in similar skimming-related activities in Southern California have been shown to use their phones to communicate with coconspirators, research ATM locations, navigate, store and record fraud-related information (e.g. electronic account information, photos and videos of contraband), conduct balance inquiries via phone and the Internet, and facilitate travel and lodging while conducting fraud-related activities. Surveillance photos show Pipkins using his cell phone while accessing U.S. Bank ATMs. Additionally, the magnetic card reader/encoder found in Pipkins' vehicle appears to have Bluetooth capability and an associated mobile phone application, which is further evidence that Pipkins' phone was likely being used in furtherance of and as an instrumentality of skimming-related fraud.

AFFIDAVIT

-11-

32.     At the time of his arrest, Pipkins possessed one white USB storage device labeled "The Suburban Collection" in red lettering in his wallet. Based on the fact that Pipkins accessed his cell phone while using the US Bank ATMs, the fact that he only had four cloned cards in his possession at the time of arrest, and the fact that he had a mobile phone-compatible card reader/encoder, it is likely that he reencoded cards between ATM visits. Stolen personal information, such as debit and credit card numbers, are often harvested from skimming devices and stored on external media such as USB storage devices. It is therefore highly likely that the USB device found in Pipkins' wallet contains evidence of and relating to skimming and EBT fraud-related activity.

<u>Procedures for Electronically-Stored Information</u>

**External USB Storage Device**

33.     With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

*Seizure and Retention of Instrumentalities*

34.     Based upon the foregoing, there is probable cause to believe that the subject premise is likely to contain computers, iPads, and electronic storage devices that may contain contraband and fruits of crime as provided at Rule 41(c)(2) of the Federal Rules of Criminal Procedure, or were used in committing crime as provided at Rule 41(c)(3), and are therefore instrumentalities of the enumerated offenses. If so, any such computers or electronic storage devices (collectively, "the subject devices") are subject to seizure, retention, and possible forfeiture and destruction.

35.     The imaging and preliminary analysis of the subject devices to confirm their status as instrumentalities will be conducted within forty-five (45) days of this warrant being signed. Seized items confirmed to be instrumentalities will not be

returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be available to be reclaimed. An image of the subject devices will be retained and subjected to a complete forensic analysis, however, as provided below.

36.    If the subject devices are retained as instrumentalities they will not be returned to the owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. If the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g) of the Federal Rules of Criminal Procedure.

### Identification and Extraction of Relevant Data

37.    A forensic image is an exact physical copy of the hard drive or other electronic storage media. After obtaining a forensic image, the imaged copy will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

38.     Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

39.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed,

deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

40.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent to 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent to 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

41.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data from the subject devices will complete the analysis within one-hundred twenty (**120**) days from the date this warrant is signed, absent further application to this court.

42.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

### Cell Phones

43.     It is not possible to determine, merely by knowing the cellular phone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device

AFFIDAVIT

-16-

may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

44.     Following the issuance of this warrant, the USSS will collect the subject cellular telephone and subject it to analysis. If there are technological challenges, the examiners may need to consult with other law enforcement partners.   All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

45.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.   The personnel conducting the identification and extraction of data will complete the analysis within ninety (**90**) days of the date the warrant is signed, absent further application to this court.

<u>PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE</u>

46.     The United States is unaware at this time of other attempts to search the subject devices.

<u>CONCLUSION</u>

47.     For the reasons described above, there is probable cause to believe that Devonte Pipkins, did knowingly and with intent to defraud use one and more

//

//

unauthorized access devices during a one-year period, and by such conduct obtain cash and other things of value aggregating $1,000 and more during such one-year period in violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

_____

Special Agent Alan Ottarson
UNITED STATES SECRET SERVICE

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on June 2, 2023.

_____

HON. JILL L. BURKHARDT
US MAGISTRATE JUDGE

AFFIDAVIT

-18-

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

      a.     Apple iPhone 14 in a green case inventoried as 4122023CE053 Item #1;

      b.     White USB drive labeled "The Suburban Connection"

(the **"Target Devices"**).

The Target Devices are currently in the custody and control of U.S. Secret Service at 550 W. C St, Suite 660, San Diego, CA 92101.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the Target Devices described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below.  The seizure and search of the Target Devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Devices will be electronic records, communications, and data such as emails, text messages, mobile messaging application content, social media content, images, records from third-party and websites applications (e.g., Mapquest, Google Maps), photographs, audio files, videos, browsing history, and location data, for the period of March 1, 2022, up to and including June 2, 2023, for the following:

a.   Communications, records, images, videos, electronic files, and attachments tending to discuss or pertain to access devices (e.g., EBT cards, EDD cards, debit cards, the electronic track data embedded on such cards) or account information associated with such devices (e.g., PINs, names), including but not limited to the unauthorized use, interception, collection, transfer, or possession of such devices or related account information;

b.   Communications, records, images, videos, electronic files, and attachments tending to discuss or pertain to skimming devices, or the location or manner in which such devices are installed, deployed, distributed, collected, or manufactured;

c.   Communications, records, images, videos, electronic files, and attachments tending to discuss or reflect an intent to i) steal or misuse access devices, or account information associated with such devices, or ii) install, deploy, distribute, collect, or manufacture unauthorized skimming devices, that would tend to discuss or establish motive,

opportunity, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, with regard to the crimes under investigation;

d.    Communications, records, images, videos, electronic files, and attachments tending to identify the user(s) of, or persons with control over or access to, the Target Devices, including the telephone number associated with any of the Target Devices and, without any date restriction, all contact entries;

e.    Communications, records, images, videos, electronic files, and attachments tending to identify the user(s) of the Target Devices' state of mind, knowledge, motive, and voluntariness regarding the crime under investigation, such as any communications, records, or attachments demonstrating knowledge that EBT or EDD account information, PINs, victim names, skimmers, or access devices were being used without authorization or with an intent to deceive;

f.    Communications, records, images, videos, electronic files, and attachments tending to identify or establish the use of fake or stolen personal identification information, such as the names or PINs found on California Advantage cards;

g.    Communications, records, images, videos, electronic files, and attachments tending to identify any co-conspirators, co-schemers, criminal associates, or others involved in a scheme to steal or misuse access device card information; and

h.    Communications, records, images, videos, electronic files, and attachments that provide context to any communications, records, images, videos, electronic files, and attachments described above, such as electronic messages sent or received in temporal proximity to any relevant electronic message and any content tending to identify the user(s) of the device to be searched;

**which are evidence of violations of 18 U.S.C. § 1029(a)(2).**